716 So.2d 295 (1998)
KENTUCKY FRIED CHICKEN and Crawford & Company, Appellants/Cross-Appellees,
v.
Laurie TYLER, Appellee/Cross-Appellant.
No. 97-1449.
District Court of Appeal of Florida, First District.
July 27, 1998.
Rehearing Denied August 28, 1998.
*296 David J. LoNigro of Oxendine & Oxendine, P.A., Tampa, for Appellants/Cross-Appellees.
John Hugh Shannon of John Hugh Shannon, a professional association, Lakeland, for Appellee/Cross-Appellant.
BENTON, Judge.
Kentucky Fried Chicken and Crawford & Company appeal a compensation order ruling Laurie Tyler entitled to payment for Dr. Merritt's bills for past chiropractic services he rendered, to psychiatric evaluation and treatment, and to temporary partial disability (wage-loss) benefits, and finding that she had not reached maximum medical improvement. We affirm the award of payment for Dr. Merritt's bills and authorization for a psychiatric evaluation. But we reverse on the other points urged on the main appeal and remand with directions.
Ms. Tyler cross-appeals, arguing that the judge of compensation claims erred in ordering that new doctors be named to treat her, instead of authorizing previously unauthorized physicians who had been treating her. On the cross-appeal, we affirm because the issue was not preserved by appropriate objection below.
*297 While working for Kentucky Fried Chicken on October 23, 1988, Ms. Tyler slipped and fell on a ramp leading to a walk-in cooler, injuring her lower back. On November 11, 1988, Dr. Mahan[1] released Ms. Tyler to return to work, albeit with restrictions on heavy lifting and bending.
With the exception of ten days immediately after her fall, Ms. Tyler worked for Kentucky Fried Chicken for the nine months that followed her industrial accident. After she left Kentucky Fried Chicken, she worked at an Olive Garden Restaurant for about six months, and then took seasonal jobs at a cannery. Since 1991, she has been employed by The Whitehead Nursery, working in a greenhouse.

Evaluation and Treatment
In October of 1990, some two years after the industrial accident, Ms. Tyler went to see Dr. Brackett, a neurologist who was authorized to evaluate and treat her. Dr. Brackett ordered a computerized tomographic scan which revealed no abnormality, prescribed anti-inflammatory medication, and told Ms. Tyler to continue with mobilization exercises.
Ms. Tyler next sought medical treatment in April of 1992, when she went to an unauthorized chiropractor, Dr. Merritt.[2] Dr. Merritt treated Ms. Tyler from April until June of 1992. On June 22, 1992, he declared that she had attained maximum medical improvement with a permanent impairment rating of twenty-five per cent, released her from further treatment, released her to light or sedentary work, and recommended a psychiatric evaluation.[3]
After Dr. Merritt released her, Ms. Tyler sought out Dr. Hendricks, another unauthorized chiropractor. Dr. Hendricks treated her from July until September of 1992, at which point he informed her he had no further treatment to offer her. Ms. Tyler returned to Dr. Merritt in August of 1994, and continued to receive chiropractic adjustments from him until the final hearing.
In October of 1993, the employer sent the claimant to Dr. Sullivan, an orthopedist, for an independent medical examination. Dr. Sullivan found no orthopedic basis for Ms. Tyler's complaints, and opined that she had reached maximum medical improvement from an orthopedic perspective long before he had examined her.

Payment For Dr. Merritt's Past Treatment
In a claim for benefits dated May 26, 1992, Ms. Tyler requested that a chiropractor be authorized. Dr. Merritt requested authorization to treat her at approximately the same time. Appellants denied the request for authorization of a chiropractor and never authorized a chiropractor to treat Ms. Tyler.[4] They denied the claim on grounds that a chiropractor had not been medically necessary, requested, or authorized, and that all needed medical care had been provided.
Because the employer did not authorize chiropractic treatment when requested (or go to a judge of compensation claims to contest the need for chiropractic treatment) and because the judge of compensation claims concluded that chiropractic treatment was medically reasonable and necessary, he awarded payment for chiropractic treatment Dr. Merritt rendered. We affirm this award.
*298 Kentucky Fried Chicken contends that the award should be reversed because it authorized several other physicians to treat Ms. Tyler, even though it never authorized Dr. Merritt or any other chiropractor. But the availability of treating doctors other than chiropractors did not discharge the employer's responsibility to provide chiropractic treatment. See Kirkland v. Harold Pratt Paving, Inc., 518 So.2d 1320, 1325 (Fla. 1st DCA 1987).

Psychiatric Claim
Ms. Tyler filed a claim for psychological evaluation and treatment in July of 1992. The judge of compensation claims ruled that Ms. Tyler needed psychiatric treatment, that her need for psychiatric treatment was causally related to the 1988 fall at work, and that she had not yet reached maximum medical improvement from a psychiatric perspective.
Since neither Ms. Tyler's lay testimony nor Dr. McClane's records established a causal connection between her industrial accident and a need for psychiatric treatment, we reverse the award both of prospective psychiatric treatment and of payment for Dr. McClane's medical bills. "The Judge erred in authorizing psychiatric care absent evidence that such care is medically necessary. The claimant presented no medical testimony that her psychiatric condition was causally related to her industrial injury." Wal Mart Stores, Inc. v. Mann, 690 So.2d 649, 650 (Fla. 1st DCA 1997). We affirm, however, the award of a psychiatric evaluation. See Blackshear v. Bethune Cookman College, 467 So.2d 721 (Fla. 1st DCA 1985).
"To be compensable, a post-traumatic mental disorder must be the direct and immediate result of the industrial injury." Greater Miami Academy v. Blum, 466 So.2d 1263, 1264 (Fla. 1st DCA 1985). "Under the law in effect at the time of the claimant's industrial accident, a mental or psychological injury or condition, to be compensable, had `to be predicated on a physical injury and to directly and immediately result therefrom.' Anderson v. Wales Indus., 688 So.2d 379, 380-81 (Fla. 1st DCA 1997), citing Ackley v. General Parcel Serv., 646 So.2d 242 (Fla. 1st DCA 1994)." Leon County Sch. Bd. v. Green, 711 So.2d 86, 88 (Fla. 1st DCA 1998).
As a result of Ms. Tyler's husband's own work-related disability, her husband's former employer provided counseling by Dr. McClane, a psychiatrist. Ms. Tyler sometimes accompanied her husband at counseling sessions Dr. McClane conducted. At one point in 1994, Dr. McClane prescribed medication for what he diagnosed as Ms. Tyler's depression. Although Dr. McClane did not testify, a letter came in evidence without objection in which he recommended that she be evaluated to determine whether what seemed to be depression was related to her accident at work. Dr. McClane never performed an evaluation himself to ascertain the cause of Ms. Tyler's apparent depression.
Dr. McClane's letter of May 31, 1996, supports the need for a psychiatric evaluation (as did Dr. Merritt's recommendation) but it is not competent substantial evidence that Ms. Tyler's psychiatric condition is the direct and immediate result of a physical injury sustained in her 1988 fall at work. The letter states, in pertinent part:
What you need is a thorough evaluation psychiatrically (which I have never had the opportunity to perform). You need this evaluation primarily to determine what treatment you need and how to get you better. You also need this evaluation to determine how much of this problem is related to your injury and chronic pain for medico/legal purposes.
This letter indicates a need for a psychiatric evaluation but neither the letter nor a cryptic treatment note from a joint counseling session on March 30, 1994viz., "V-dep + anx. Re: continued bk pain and necessity to keep wk'ng,"provide competent substantial evidence that the industrial accident caused a psychiatric condition requiring treatment.

Maximum Medical Improvement Reached
The judge of compensation claims found that Ms. Tyler had not attained maximum medical improvement (psychiatrically or physically) by the time of the hearing, and awarded temporary partial disability wage-loss benefits on that premise. On this record, the possibility of psychiatric improvement is not germane. Absent proof of psychiatric *299 injury causally connected to a compensable accident, the question of maximum psychiatric improvement has no legal significance.
Properly at issue is whether Ms. Tyler had reached maximum medical improvement from a physical perspective. In finding that she had not, the judge of compensation claims cited the "particularly persuasive" testimony[5] of Dr. Hendricks "that he did not feel comfortable in making that determination [maximum medical improvement] without further examination and work up." We reverse the determination that Ms. Tyler had not reached maximum medical improvement from her physical injury as contrary to unrebutted evidence that she had. See, e.g., Gaddis v. Allied Plastics, 649 So.2d 904 (Fla. 1st DCA 1995) (reversing because a judge of compensation claims rejected without explanation unrefuted medical evidence).
In contrast to Dr. Hendricks's neutral views on maximum medical improvement, the unequivocal opinion of Dr. Merritt, the unauthorized chiropractor, put Ms. Tyler at maximum medical improvement as of June 22, 1992. Drs. Mahan and Taxdal were never asked to assign maximum medical improvement dates, but released claimant to return to work without further medical treatment only weeks after the 1988 industrial accident.
Dr. Brackett, who examined her in 1990 and again in 1992, finding no neurological deficit either time, was never asked to assess maximum medical improvement. Dr. Sullivan, the orthopedist, opined in the fall of 1993 that Ms. Tyler had long since reached maximum medical improvement from an orthopedic perspective.
The judge of compensation claims stated in his final order that "there is a reasonable expectation that further improvement in the Claimant's condition is possible," and found that maximum medical improvement had not been reached. But no medical evidence[6] supports a finding that Ms. Tyler was expected to improve physically with further treatment after June 22, 1992. Dr. Merritt was the only doctor treating Ms. Tyler at the time of the final hearing and his treatment was palliative. Because the judge of compensation claims rejected unrebutted evidence that Ms. Tyler had reached maximum medical improvement[7] from a physical perspective as of June 22, 1992, we reverse and remand with directions that the date of maximum medical improvement be set at June 22, 1992. See Pan American Hosp. v. Fleitas, 645 So.2d 1033, 1034 (Fla. 1st DCA 1994). The order under review is reversed to the extent that it authorizes remedial care after June 22, 1992.

Indemnity Benefits
Ms. Tyler claimed wage-loss benefits for six biweekly periods alternatively as temporary partial disability benefits and as permanent wage-loss benefits.[8] The judge of *300 compensation claims awarded temporary partial disability benefits for all six periods on the premise that she was not yet at maximum medical improvement. Because she had attained maximum medical improvement by June 22, 1992, the award of temporary partial disability benefits was error. We turn, therefore, to the question whether the award can be upheld as an award of (permanent) wage-loss benefits.
Under the statute in effect on the date of the accident, wage-loss benefits are barred if sought for periods more than two years after the last day of the month in which maximum medical improvement has been attained, unless wage-loss benefits were payable for three consecutive months during that two-year period. § 440.15(3)(b)3.a., Florida Statutes (1987).
The right to wage-loss benefits shall terminate:
a. As of the end of any 2-year period commencing at any time subsequent to the month when the injured employee reaches the date of maximum medical improvement, unless during such 2-year period wage-loss benefits shall have been payable during at least 3 consecutive months.
Id. In the present case, at least two years had passed[9] without entitlement to payment of wage-loss benefits for three consecutive months for every period claimed except for the initial two-week period from July 11 to July 24, 1992. (The next period for which wage loss was claimed began in August of 1994.) As to this initial two-week period, we direct that the award be reclassified on remand as (permanent) wage-loss benefits subject to all pertinent set-offs.
Ms. Tyler's claim for wage-loss benefits is statutorily barred, however, as to the remaining five periods. We reject her argument that the two-year statutory period did not run because her employer did not inform her of her right to wage-loss benefits. In this context, a claimant's knowledge of the need to fill out wage-loss forms has been held to be immaterial. See Weiss v. City of Tampa Police Dep't, 632 So.2d 129 (Fla. 1st DCA 1994). The statute makes determinative whether benefits were payable, not whether they were in fact paid. We also note that Ms. Tyler was represented by counsel long before the statute ran, and that she testified that her counsel informed her how wage-loss benefits could be claimed. Cf. McCrory Stores/National Union v. Workman, 596 So.2d 804 (Fla. 1st DCA 1992).
Once a claim for wage-loss benefits is statutorily barred, setting another maximum medical improvement date does not revive or reestablish entitlement to benefits.
Further, although we recognize that a claimant may have more than one MMI date, neither section 440.15(3)(b)3 nor the case law interpreting that section provides for any of the time limitations in subsection (3)(b)3 to be reactivated if the claimant does reach a subsequent point of MMI. Accordingly, we reverse the JCC's award of wage-loss benefits from December 17, 1987 and continuing, on the basis that the award is barred by section 440.15(3)(b) 3.a., Florida Statutes (1979).
American Airlines v. Miller, 575 So.2d 669, 670 (Fla. 1st DCA 1991). If Ms. Tyler succeeds on remand in proving a direct and immediate causal connection between physical injury sustained in the industrial accident and a psychiatric condition which requires treatment, she will be entitled to medical (psychiatric) benefits and perhaps to temporary disability benefits, but not to additional (permanent) wage-loss benefits.
Affirmed in part, reversed in part, and remanded with directions.
ERVIN and VAN NORTWICK, JJ., concur.
NOTES
[1] Her employer authorized treatment with Dr. Mahan, an orthopedist. He prescribed anti-inflammatory medication and offered steroid injections, which claimant refused.

Dr. Mahan referred Ms. Tyler to Dr. Taxdal, a neurologist, for evaluation and treatment. Dr. Taxdal, who was also authorized by the employer, found no neurological deficit. On November 16, 1988, he released Ms. Tyler from his care with a restriction against lifting more than 25 pounds. Neither Dr. Mahan nor Dr. Taxdal assigned Ms. Tyler any permanent impairment rating.
[2] She returned to Dr. Brackett for a further neurological evaluation in May of 1992. Dr. Brackett ordered magnetic resonance imaging and elecromyography, and again found noneurological deficit.
[3] Because he had no further treatment to offer, Dr. Merritt recommended an evaluation by an allopathic physician, apparently unaware of the examinations Dr. Brackett had performed as recently as May of 1992.
[4] The employer did pay Dr. Hendricks's bills at some point after he had treated Ms. Tyler, after initially denying his request for authorization to treat Ms. Tyler by letter dated September 14, 1992.
[5] Dr. Hendricks's testimony was:

In September of '92, which is the last time I had seen Laurie[,] ... I didn't feel comfortable in determining that she was at MMI, but this particular chiropractor felt that's all he could offer her at this time....
For example, if I were to examine her today I don't know what I would find, but if the findings were in keeping with what I'd found in September of '92 today, then I would have the opinion that she'd plateaued and she was stuck there with some possible soft tissue damage. And again that's only a guess.
He was later asked:
Q And as I understand your testimony based on your evaluation in September, you made no determination at that time nor can you unless you do a re-evaluation of this lady[,] whether or not that she is plateaued and whether or not there is any permanency?
A That's correct.
Dr. Hendricks expressed no opinion on maximum medical improvement, to a reasonable degree of medical certainty.
[6] On appeal claimant's only cited support for this finding by the judge of compensation claims is that "Mr. Tyler testified that he felt [Ms.] Tyler improved from the treatment of both Dr. Merritt and Dr. McClane."
[7] Both parties had listed maximum medical improvement dates in the pretrial stipulation, although the judge of compensation claims rejected this portion of the stipulation because of an ore tenus motion to conform the pretrial stipulation to the evidence adduced at trial. The record does not support the suggestion that Dr. Hendricks's testimony contradicts maximum medical improvement as of June 22, 1992.
[8] Since leaving Kentucky Fried Chicken, Ms. Tyler testified, she has always made at least as much as she did working at Kentucky Fried Chicken, except when she was laid off from seasonal work, and when Dr. Merritt took her off work from August to October in 1994.

Her testimony did not explain the two-week period in July of 1992 for which she seeks wageloss benefits, but a wage-loss form for the period dated July 24, 1992, is in the record.
[9] Since maximum medical improvement was attained on June 22, 1992, the two-year period began on July 1, 1992, the first "time subsequent to the month when the injured employee reaches the date of maximum medical improvement." § 440.15(3)(b)3.a., Fla. Stat. (1987).